WOLSEY *v.* CHAPMAN.

1. It has been settled in this court that the title of the Des Moines Navigation and Railroad Company to the lands donated to the State of Iowa for the improvement of the Des Moines River by the act of Aug. 8, 1846 (9 Stat. 77), is good against the State, the railroad companies claiming under the act of May 15, 1856 (11 id. 9), and, after 1855, as against pre-emptors under the act of Sept. 4, 1841.　5 id. 453.

2. The order of the Secretary of the Interior of April 6, 1850, directing that the lands on the Des Moines River above the Raccoon Fork be reserved from sale, was, in contemplation of law, the order of the President, and had the same effect as a proclamation mentioned in said act of 1841.　Being so reserved, they were not subject to selection by the State of Iowa, as forming a part of the five hundred thousand acres granted to her for internal improvements, which she, with the consent of Congress, appropriated to the use of common schools.

3. The title which the State acquired to the lands above said Raccoon Fork by the joint resolution of March 2, 1861 (12 Stat. 251), and the act of July 12, 1862 (id. 543), inured to *bona fide* purchasers from the State under the grant of Aug. 8, 1846, and not to parties whose right is derived from her claim to them for school purposes.

4. Those acts give the State and such *bona fide* purchasers the same assurance of title as if the act of 1846 had granted all that succeeding legislation secured for the river improvement.

5. The adjustment made in 1866 by the Department of the Interior and a commissioner acting under the authority of the State of Iowa, and ratified by the act of Congress, approved March 3, 1871 (16 Stat. 582), settled the rights of no parties other than the State and the United States.

6. The contract entered into June 9, 1854, between the State and the Des Moines Navigation and Railroad Company, contemplated a conveyance of all the river-grant lands not sold by the State on Dec. 23, 1853.　By a joint resolution passed March 22, 1858, the State agreed to convey to the company all the lands contained in said grant except such as she had sold prior to Dec. 23, 1853.　*Held*, that the land in controversy having been certified as part of the lands granted to Iowa for the improvement of the Des Moines River, the governor of the State was authorized to convey it to said company.

APPEAL from the Circuit Court of the United States for the District of Iowa.

The facts are stated in the opinion of the court.

The case was argued by *Mr. Galusha Parsons* for the appellants, and by *Mr. George G. Wright* for the appellee.

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

This case presents again for consideration the Des Moines River improvement grant; 9 Stat. 77. It is a suit in equity brought by Chapman, who claims under the river grant, to quiet his title as against Wolsey, whose rights depend on a patent from the State of Iowa granting the lands in dispute as part of lands ceded to the State under the eighth section of the act of Congress passed Sept. 4, 1841, entitled " An Act to appropriate the proceeds of the sales of the public lands and to grant pre-emption rights. " 5 id. 453. That section is as follows : —

" SECT. 8. And be it further enacted, that there shall be granted to each State specified in the first section of this act five hundred thousand acres of land for purposes of internal improvement: *Provided,* that to each of the said States which has already received grants for said purposes there is hereby granted no more than a quantity of land which shall, together with the amount such State has already received as aforesaid, make five hundred thousand acres, the selections in all of the said States to be made within their limits respectively in such manner as the legislature thereof shall direct; and located in parcels conformably to sectional divisions and subdivisions, of not less than three hundred and twenty acres in any one location, on any public land except such as is or may be reserved from sale by any law of Congress or proclamation of the President of the United States, which said locations may be made at any time after the lands of the United States in said States respectively shall have been surveyed according to existing laws. And there shall be, and hereby is, granted to each new State that shall be hereafter admitted into the Union, upon such admission, so much land as, including such quantity as may have been granted to such State before its admission, and while under territorial government, for purposes of internal improvement as aforesaid, as shall make five hundred thousand acres of land, to be selected and located as aforesaid."

Sect. 10 granted pre-emption rights in the public lands, but provided that " no lands included in any reservation, by any treaty, law, or proclamation of the President of the United States, or reserved for salines, or for other purposes; no lands

reserved for the support of schools, nor the lands acquired by either of the two last treaties with the Miami tribe of Indians in the State of Indiana, or which may be acquired of the Wyandot tribe of Indians in the State of Ohio, or other Indian reservation to which the title has been or may be extinguished by the United States at any time during the operation of this act; no sections of land reserved to the United States alternate to other sections granted to any of the States for the construction of any canal, railroad, or other public improvement; no sections or fractions of sections included within the limits of any incorporated town; no portions of the public lands which have been selected as the site for a city or town; no parcel or lot of land actually settled and occupied for the purposes of trade and not agriculture; and no lands on which are situated any known salines or mines, shall be liable to entry under and by virtue of the provisions of this act."

At that time Iowa was a Territory, organized under the act of June 12, 1838. Id. 235. On the 8th of August, 1846, Congress passed the act making the Des Moines River grant (9 Stat. 77), the material parts of which are as follows:—

"An Act granting certain lands to the Territory of Iowa, to aid in the improvement of the navigation of the Des Moines River, in said Territory.

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, that there be, and hereby is, granted to the Territory of Iowa, for the purpose of aiding said Territory to improve the navigation of the Des Moines River from its mouth to the Raccoon Fork (so-called) in said Territory, one equal moiety, in alternate sections, of the public lands (remaining unsold, and not otherwise disposed of, incumbered, or appropriated), in a strip five miles in width on each side of said river, to be selected within said Territory by an agent or agents to be appointed by the governor thereof, subject to the approval of the Secretary of the Treasury of the United States.

"SEC. 2. And be it further enacted, that the lands hereby granted shall not be conveyed or disposed of by said Territory, nor by any State to be formed out of the same, except as said improvements shall progress; that is, the said Territory or State may sell so much of said lands as shall produce the sum of $30,000, and then the sales shall cease until the governor of said

Territory or State shall certify the fact to the President of the United States that one-half of said sum has been expended upon said improvements, when the said Territory or State may sell and convey a quantity of the residue of said lands sufficient to replace the amount expended; and thus the sale shall progress as the proceeds thereof shall be expended, and the fact of such expenditure shall be certified as aforesaid.

"SEC. 4. And be it further enacted, that whenever the Territory of Iowa shall be admitted into the Union as a State, the lands hereby granted for the above purpose shall be and become the property of said State for the purpose contemplated in this act, and no other, provided the legislature of the State of Iowa shall accept the said grant for the said purpose."

On the 28th of December, 1846, Iowa was admitted into the Union as a State. 9 id. 117. By the Constitution, under which the admission was granted, the 500,000 acres of land to which the State became entitled by the act of 1841 were appropriated to the use of common schools (Const. Iowa, 1846, art. 9; School Fund and Schools, sect. 3), and on the 2d of March, 1849, Congress, by a special act, assented to this appropriation. Id. 349.

On the 17th of October, 1846, the Commissioner of the General Land-Office requested the governor of the Territory to appoint an agent to select the land under the river grant, at the same time intimating that the grant only extended from the Missouri line to the Raccoon Fork of the Des Moines River. On the 17th of December, a few days before the admission of the State, the territorial authorities designated the odd-numbered sections as the lands selected under the grant. The State accepted the grant in form by joint resolution of the General Assembly approved Jan. 9, 1847. On the 24th of February following, the State created a "Board of Public Works," to whom were committed the work, construction, and management of the river improvement, and the care, control, sale, disposal, and management of the lands granted the State by the act of 1846. This board was organized Sept. 22, 1847, and on the 17th of February, 1848, the Commissioner of the General Land-Office, in an official communication to the secretary of the board, gave it as the opinion of his office that

the grant extended throughout the whole length of the river within the limits of the State. On the 19th of June, 1848, without any notice of a revocation of this opinion, a proclamation was issued by the President, putting in market some of the lands above the Raccoon Fork the title to which would pass to the State if the Commissioner was right in the construction he gave the grant. This led to a correspondence on the subject between the proper officers of the State and the United States, which resulted in the promulgation of an official opinion by the Secretary of the Treasury, bearing date March 2, 1849, to the effect that the grant extended from the Missouri line to the source of the river. In consequence of this opinion, the Commissioner of the General Land-Office, on the 1st of the following June, directed the registers and receivers of the local land-offices to withhold from sale all the odd-numbered sections within five miles on each side of the river above the Raccoon Fork.

Afterwards, the State authorities called on the Commissioner of the General Land-Office for a list of lands above the Raccoon Fork which would fall to the State under this ruling. The list was accordingly made out, and on the 14th of January, 1850, submitted to the Secretary of the Interior for approval; jurisdiction of matters of that kind having before that date been transferred by law from the Treasury to the Interior Department. On the 6th of April, the Secretary returned the list to the land-office with a letter declining to recognize the grant as extending above the Raccoon Fork without the aid of an explanatory act of Congress, but advised that any immediate steps for bringing the lands into market be postponed, in order that Congress might have an opportunity of acting on the matter if it saw fit.

On the 20th of July, 1850, the agent of the State having in charge the school lands and school fund gave notice at the General Land-Office that he had selected the particular piece of land in controversy in this suit as part of the 500,000-acre grant under the act of 1841. Other lands coming within the river grant, if extended above the Raccoon Fork, amounting in the aggregate with this piece to $12,813\frac{51}{100}$ acres, were included in a list of similar selections approved at the Land Department

in Washington on the 20th of February, 1851. Two days afterwards, February 22, the Board of Public Works of the State formally demanded of the Secretary of the Interior for the river grant all the alternate odd sections above the fork. On the 26th of July the order of the Secretary of the Interior, under date of April 6, 1850, withholding the disputed lands from sale, was continued in force until the end of the approaching session of Congress, in order to give the State an opportunity of petitioning for an extension of the grant.

On the 29th of October, 1851, the Secretary of the Interior, after consultation with the President and his Cabinet, and pursuant to a decision there made, wrote the Commissioner of the General Land-Office as follows: —

" SIR, — I herewith return all the papers in the Des Moines case, which were recalled from your office about the first of the present month.

" I have reconsidered and carefully reviewed my decision of the 26th July last, and in doing so find that no decision which I can make will be final, as the question involved partakes more of a judicial than an executive character, which must ultimately be determined by the judicial tribunals of the country; and although my own opinion on the true construction of the grant is unchanged, yet in view of the great conflict of opinion among the executive officers of the government, and also in view of the opinions of several eminent jurists which have been presented to me in favor of the construction contended for by the State, I am willing to recognize the claim of the State, and to approve the selections without prejudice to the rights, if any there be, of other parties, thus leaving the question as to the proper construction of the statute entirely open to the action of the judiciary. You will please, therefore, as soon as may be practicable, submit for my approval such lists as may have been prepared, and proceed to report for like approval lists of the alternate sections claimed by the State of Iowa above the Raccoon Fork, as far as the surveys have progressed, or may hereafter be completed and returned."

The lists were submitted accordingly, and the following indorsement was made thereon by the Secretary: —

" The selections embraced in the within list (No. 3) are hereby approved in accordance with the views expressed in my letter of

the 29th instant to the Commissioner of the General Land-Office, subject to any rights which may have existed at the time the selections were made known to the land-office by the agents of the State, it being expressly understood that this approval conveys to the State no title to any tract or tracts which may have been sold or otherwise disposed of prior to the receipt by the local land-officers of the letter of the Commissioner of the General Land-Office, communicating the decision of Mr. Secretary Walker, to the effect that the grant extended above the Raccoon Fork."

No. 3 showed the vacant lands above the Raccoon Fork subject to the claim of the State, and included the particular parcel involved in this suit. On the 16th of March, 1852, the list was forwarded to the several local land-offices as showing the land which fell to the State under the construction given the river grant by the Secretary of the Treasury, March 2, 1849, and by the Secretary of the Interior, Oct. 29, 1851.

On the 20th of August, 1853, the school-fund commissioner of Webster County, under the authority of an act of the General Assembly of the State of the 25th of February, 1847, entitled "An Act to provide for the management and disposition of the school fund," contracted to sell to William T. Wolsey the land about which this suit arose. The purchase-money having been paid in full, the governor of the State, on the 20th of December, 1854, issued to Wolsey a patent in the form required to pass title under such a sale. This patent purported on its face to have been granted as and for a conveyance of school lands.

On the 6th of January, 1854, after the contract of sale to Wolsey, but before the issue of the patent, the Commissioner of the General Land-Office formally withdrew the approval by the Land Department of the selection of lands as part of the 500,000-acre grant which fell within the river grant, according to the opinion of the Secretary of the Treasury, March 2, 1849, and the Secretary of the Interior, Oct. 29, 1851. On the 30th of December, 1853, the Secretary of the Interior approved to the State, "under the act of Aug. 8, 1846, without prejudice to the rights, if any there be, of other parties," a list of the 12,813$\frac{51}{100}$ acres erroneously approved, 20th February, 1851, as lands selected under the act of 1841, "previous to the adjust-

ment of the grant, and before it was known that they belonged to the State under the Des Moines River grant."

Until the 17th of December, 1853, the State itself, through its board of public works, carried on the work of improving the river, paying the expense from the proceeds of the sales of the lands included in the river grant. A land-office had also been established for the sale of these lands. On that day the State entered into a contract with one Henry O'Reilly to complete the work. This contract O'Reilly transferred, with the consent of the State, to the Des Moines Navigation and Railroad Company, a New York corporation, and on the 9th of June, 1854, in consequence of this transfer, a new contract was entered into between the State and the corporation for the purpose of simplifying and more fully explaining the original contracts and agreements. By the new contract the State agreed to convey to the company " all of the lands donated to the State of Iowa for the improvement of the Des Moines River by act of Congress of Aug. 8, 1846, which the said party of the second part" (the State) "had not sold up to the twenty-third day of December, 1853." This was the date at which it was supposed the sale of the lands could be stopped at the State land-office after the contract with O'Reilly.

On the 15th of May, 1856, Congress passed an act (11 Stat. 9) granting to the State of Iowa, to aid in the construction of certain railroads, every alternate section of land designated by odd numbers for six sections in width on each side of each of the several roads. The granting clause of the act contained, however, the following proviso : —

"*And provided further*, that any and all lands heretofore reserved to the United States by any act of Congress, or in any other manner by competent authority, for the purpose of aiding in any object of internal improvement, or for any other purpose whatsoever, be and the same are hereby reserved to the United States from the operation of this act, except so far as it may be found necessary to locate the routes of said railroads through such reserved lands, in which case the right of way only shall be granted, subject to the approval of the President of the United States."

In 1856, the Commissioner of the General Land-Office decided not to certify any more lands to the State under the

river grant, and thereupon the Navigation Company suspended work on the improvement. This led to a settlement between the State and the company, under the authority of a joint resolution of the General Assembly for that purpose, passed March 22, 1858, by which the State agreed to convey to the Navigation Company all the lands contained in the river grant which had been approved and certified to the State by the general government, " excepting all lands sold or conveyed, or agreed to be sold or conveyed by the State of Iowa, by its officers and agents, prior to the twenty-third day of December, 1853, under said grant." Afterwards, May 3, 1858, the governor of the State executed to the company a deed conveying the lands now in controversy, with others, by a specific description of sections, townships, and ranges ; and on the 18th of the same month he executed another deed, which purported on its face to have been made pursuant to the joint resolution of the General Assembly authorizing the settlement with the company, and described the lands in the exact language of general description used in the resolution.

Chapman, the plaintiff below, has all the title to the lands involved in this suit which passed in this way to the Navigation Company.

At the December Term, 1859, and during the month of April, 1860, this court decided, in *The Dubuque & Pacific Railroad Company* v. *Litchfield* (23 How. 66), that the river grant as originally made did not extend above the Raccoon Fork, and thereupon, on the 18th of May, 1860, the Commissioner of the General Land-Office sent to the registers and receivers of the local land-offices a notice to be promulgated, as follows : —

"Notice is hereby given that the lands along the Des Moines River, in Iowa, and within the claimed limits of the Des Moines grant in that State, above the mouth of the Raccoon Fork of said river, which have been reserved from sale heretofore on account of the claim of the State thereto, will continue reserved for the time being from sale or from location by any species of scrip or warrants, notwithstanding the recent decision of the Supreme Court against the claim.

" This action is deemed necessary to afford time for Congress to consider, upon memorial or otherwise, the case of actual, *bona fide*

settlers holding under titles from the State, and to make such provision, by confirmation or adjustment of the claims of such settlers, as may appear to be right and proper."

On the 2d of March, 1861 (12 Stat. 251), Congress passed the following joint resolution : —

- "*Joint Resolution to quiet title to lands in the State of Iowa.*

" Resolved by the Senate and House of Representatives of the United States of America in Congress assembled, that all the title which the United States still retain in the tracts of land along the Des Moines River, and above the mouth of the Raccoon. Fork thereof, in the State of Iowa, which have been certified to said State improperly by the Department of the Interior as part of the grant by act of Congress, approved Aug. 8, 1846, and which is now held by *bona fide* purchasers under the State of Iowa, be and the same is hereby relinquished to the State of Iowa."

And on the 12th of July, 1862 (id. 543), the following act was passed : —

" Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, that the grant of lands to the then Territory of Iowa, for the improvement of the Des Moines River, made by the act of Aug. 8, 1846, is hereby extended so as to include the alternate sections (designated by odd numbers) lying within five miles of said river, between the Raccoon Fork and the northern boundary of said State ; such lands are to be held and applied in accordance with provisions of the original grant, except that the consent of Congress is hereby given to the application of a portion thereof to aid in the construction of the Keokuk, Fort Des Moines, & Minnesota Railroad, in accordance with the provisions of the act of the General Assembly of the State of Iowa, approved March 22, 1858 ; and if any of said lands shall have been sold or otherwise disposed of by the United States before the passage of this act, excepting those released by the United States to the grantees of the State of Iowa, under the joint resolution of March 2, 1862, the Secretary of the Interior is hereby directed to set apart an equal amount of lands within said State to be certified in lieu thereof : *Provided*, that if the said State shall have sold and conveyed any portion of the lands lying within the limits of this grant, the title of which has proved invalid, any lands which shall

be certified to said State in lieu thereof, by virtue of the provisions of this act, shall inure to and be held as a trust fund for the benefit of the person or persons respectively whose titles shall have failed as aforesaid."

After the passage of the joint resolution of March 2, 1861, the Commissioner of the General Land-Office called on the governor of the State for a list of the tracts of land " held by *bona fide* purchasers of the State of Iowa " on that date.   In response to this request the governor and land commissioner of the State, on the 20th of November, 1862, furnished the list required, and among others included the tracts granted to the Navigation Company on the settlement made with that company under the joint resolution of March 22, 1858.   This list was filed in the General Land-Office Dec. 1, 1862.

On the 30th of March, 1866, an act was passed by the General Assembly of Iowa providing for the adjustment of certain land claims with the general government.   By this act Josiah A. Harvey, the register of the State land-office, was appointed a commissioner to adjust the matters in dispute, and especially the excess of land which had been certified to the State above what it was entitled to receive under the act of Sept. 4, 1841, and the lands falling due under the joint resolution of March 2, 1861, and the act of July 12, 1862.

This act contained the following section : —

" SECT. 2.  Said commissioner shall proceed to Washington City, and present said claims to the Department of the Interior, and urge the same to settlement as early and as speedily as may be consistent with the interests of the State, and he is hereby authorized to adjust the said excess of the 500,000-acre grant by permitting the United States to retain, out of the indemnity land falling to the State under said act of Congress of July 12, 1862, an amount equivalent to such excess : *Provided*, that nothing herein contained shall be construed to be a relinquishment of the claim of the State under the said 500,000-acre grant to the $12,813\frac{55}{100}$ acres selected as a part of such grant, and subsequently rejected from a supposed conflict with the act of Congress approved August, 1846, known as the Des Moines River grant; and the said commissioner is hereby instructed to secure a restoration of said selections as a part of the 500,000-acre grant, and a confirmation of the title of the State thereto, as a part of such grant."

Under this authority, an adjustment was had with the United States, by which it appeared that the State was entitled to 558,000$\frac{96}{100}$ acres, under the river grant, and that under the 500,000-acre grant it had received certificates for 22,660$\frac{5}{100}$ acres more than it was entitled to if the 12,813$\frac{51}{100}$ acres, also certified under the river grant, was not included, and 35,473$\frac{54}{100}$ if it was. The excess was charged to the account of the river grant, and a balance struck accordingly. The Navigation and Railroad Company was not a party to this settlement. The adjustment was ratified by an act of the General Assembly of the State passed March 31, 1868.

At the December Term, 1866, of this court, it was decided, in the case of *Wolcott* v. *Des Moines Company* (5 Wall. 681), that the lands included in the river grant above the Fork, as finally settled by Congress, did not pass to the State for the benefit of the railroad companies under the act of 1856, because, at the time of the passage of that act, the lands were reserved for the purpose of aiding in the improvement of the Des Moines River, and, therefore, fell within the proviso limiting the grant to lands not so reserved.

At its December Term, 1869, this court decided in *Riley* v. *Wells*, No. 397 on the docket of the term, but not reported, that the lands above the Raccoon Fork were so far " reserved " by the action of the officers of the United States as not to be subject to pre-emption in 1855, under the tenth section of the act of 1841.

On the 3d of March, 1871, Congress passed an act (16 Stat. 582), ratifying and confirming to the State of Iowa and its grantees the title to the lands, in accordance with the adjustment made in 1866; but expressly provided " that nothing in this act contained shall be so construed as to affect adversely any existing legal rights, or the rights of any party claiming title, or the right to acquire title, to any part of said lands under the provisions of the so-called homestead or pre-empted [pre-emption] laws of the United States, or claiming any part thereof as swamp lands.

At the December Term, 1872, of this court, after full consideration, the cases of *Wolcott* v. *Des Moines Company* and *Riley* v. *Wells* were distinctly affirmed in *Williams* v. *Baker* (17 Wall.

144) ; and in *Homestead Company* v. *Valley Railroad* (id. 153), it was said to be "no longer an open question that neither the State of Iowa, nor the railroad companies for whose benefit the grant of 1856 was made, took any title by that act to the lands claimed to belong to the Des Moines River grant of 1846, and that the joint resolution of 2d of March, 1861, and act of July 12, 1862, transferred the title from the United States and vested it in the State of Iowa for the use of its grantees under the river grant."

The State voluntarily made itself a party to this suit for the purpose of defending its title to the lands in controversy as part of its school lands. An act of the General Assembly was passed March 12, 1874, authorizing this to be done.

Upon this state of facts the court below granted the relief asked by the bill and sustained the title of Chapman. To reverse that decree this appeal was taken.

The following propositions were relied upon in the argument for the appellants : —

1. That the lands in question were not "reserved" lands within the meaning of the exception in sect. 8 of the act of 1841.

2. That Chapman, claiming as he did under a patent from the State later in date than that to Wolsey, cannot impeach Wolsey's title in this action.

3. That Wolsey was such a *bona fide* purchaser from the State that the grant of Congress under the joint resolution of March 2, 1861, inured to his benefit.

4. That as the lands had been sold by the State previous to Dec. 23, 1853, no title passed to the Des Moines Navigation and Railroad Company under the settlement made upon the authority of the joint resolution of the General Assembly of March 22, 1858.

5. That by the adjustment and settlement between the State and the United States in 1866, the title of the State under the 500,000-acre grant, and as part of the school lands, was confirmed.

These several propositions will be considered in their order.

1. As to the right of the State, on the 20th of February, 1851, to select these lands as part of the 500,000 acre grant.

It has been settled in this court that the title of the Des Moines Company is good as against the State and railroad companies under the railroad grant of 1856, and as against preemptioners after 1855 under the act of 1841. We are not asked to disturb these rulings, and should not be inclined to do so if we were. It is contended, however, that the language used in the eighth section of the act of 1841, defining the reservation, is so different from that of the tenth section, under consideration in *Riley* v. *Wells,* and from that of the act of 1856, involved in Wolcott's case and the cases reported in 17th Wallace, as to render our former decisions of no controlling authority on the question now to be determined. We do not so understand the effect of those decisions. Whatever might be the force of such an argument if the cases involving the act of 1856 stood alone, it seems to us impossible to distinguish the question now presented from that disposed of in *Riley* v. *Wells.* In that case the language under consideration was, " lands included in any reservation, by any treaty, law, or proclamation of the President of the United States, or reserved for salines, or for other purposes; " and in this, " any public land, except such as is or may be reserved from sale by any law of Congress or proclamation of the President of the United States." In the act of 1856 the corresponding language is, " any and all lands heretofore reserved to the United States by any act of Congress, or in any other manner by competent authority, for the purpose of aiding in any object of internal improvement, or for any other purpose whatever."

It is conceded that the lands in controversy were actually reserved from sale by competent authority when the selection was made under the act of 1841. They were reserved also in consequence of the act of 1846. The proper executive department of the government had determined that, because of doubts about the extent and operation of that act, nothing should be done to impair the rights of the State above the Raccoon Fork until the differences were settled, either by Congress or judicial decision. For that purpose an authoritative order was issued, directing the local land-officers to withhold all the disputed lands from sale. This withdrew the lands from private entry, and, as we held in *Riley* v. *Wells,* was sufficient to defeat a set-

tlement for the purpose of pre-emption while the order was in force, notwithstanding it was afterwards found that the law, by reason of which this action was taken, did not contemplate such a withdrawal.   This, it is agreed, settles the present case, unless that decision resulted from the addition of the words, " reserved for saline or for other purposes," which appear in the tenth section and not in the eighth.

The object of all interpretation is to ascertain the intent of the law-makers, — to get at the meaning which they wished their language to convey.   A critical examination of particular words is never necessary except in cases of doubt.   Sects. 8 and 10 are parts of the same act.   By one, a grant of public lands to certain States for certain purposes was provided for, and by the other, pre-emption rights were given to individual citizens.   Both had reference to public lands, and gave the respective beneficiaries the power of making their own selections.   There seems to be no good reason why the selections of the pre-emptioner should be restricted within narrower limits than those of the State, and we cannot believe it was the intention of Congress to give a State the power to take lands under sect. 8, which had actually been reserved by the United States for any purpose whatever.   It is true, in that section only reservation by a law of Congress or the proclamation of the President are specially spoken of, but it must have been the intention to include in this all lawful reservations.   In the tenth section a reservation by treaty is specially mentioned; but we can hardly believe it would be seriously contended that, under the eighth section, a State could select lands reserved by a treaty because the word " treaty " was omitted in that section.

The truth is, there can be no reservation of public lands from sale except by reason of some treaty, law, or authorized act of the Executive Department of the government; and the acts of the heads of departments, within the scope of their powers, are in law the acts of the President.   In *Wilcox* v. *Jackson* (13 Pet. 498), the question was directly presented whether a reservation from sale by an order from the War Department was a reservation " by order of the President," and the court held it was.   The language of the statute then under consideration was (p. 511), " or which is reserved from sale by act of Con-

gress or by order of the President, or which may have been appropriated for any purpose whatever;" and in the opinion of the court it is said (p. 513).: "Now, although the immediate agent in requiring this reservation was the Secretary of War, yet we feel justified in presuming that it was done by the approbation and direction of the President. The President speaks and acts through the heads of the several departments in relation to subjects which appertain to their respective duties. Both military posts and Indian affairs, including agencies, belong to the War Department. Hence we consider the act of the War Department in requiring the reservation to be made, as being in legal contemplation the act of the President; and consequently that the reservation thus made was, in legal effect, a reservation made by order of the President, within the terms of the act of Congress." That case is conclusive of this, unless the word "proclamation," as used in the present statute, has a signification so different from "order" in the other as to raise a material distinction between the two cases. We see no such intention on the part of Congress. A proclamation by the President, reserving lands from sale, is his official public announcement of an order to that effect. No particular form of such an announcement is necessary. It is sufficient if it has such publicity as accomplishes the end to be attained. If the President himself had signed the order in this case, and sent it to the registers and receivers who were to act under it, as notice, to them of what they were to do in respect to the sales of the public lands, we cannot doubt that the lands would have been reserved by proclamation within the meaning of the statute. Such being the case, it follows necessarily from the decision in *Wilcox* v. *Jackson* that such an order sent out from the appropriate executive department in the regular course of business is the legal equivalent of the President's own order to the same effect. It was, therefore, as we think, such a proclamation by the President reserving the lands from sale as was contemplated by the act. This being the case, under our former decisions, no title passed to the State by the approval of the selection of the lands in dispute under the act of 1841. Being lawfully reserved from sale at the time of the selection, they were not included in the grant which that act provided for.

·2. As to the right of Chapman to question Wolsey's title.

Of this we entertain no doubt. If the State had no title when the patent issued to Wolsey, he took nothing by the grant. No question of estoppel by warranty arises, neither does the after-acquired title inure to the benefit of Wolsey, because when the United States made the grant in 1861 it was for the benefit of *bona fide* purchasers from the State, under the grant of 1846. This is evident as well from the tenor of the joint resolution of 1861 as from the act of 1862. The relinquishment under the joint resolution is of all the title which the United States retained in the tracts of land above the Raccoon Fork " which have been certified to said State improperly by the Department of the Interior as part of the grant by the act of Congress approved Aug. 8, 1846, and which is now held by *bona fide* purchasers under the State of Iowa;" and by the act of 1862. he lands are in terms to be held and applied in accordance with the provisions of the original grant. This legislation, being *in pari materia*, is to be construed together, and manifests most unmistakably an intention on the part of Congress to put the State and *bona fide* purchasers from the State just where they would be if the original act had itself granted all that was finally given for the river improvement. The original grant contemplated sales by the State in execution of the trust created, and the *bona fide* purchasers referred to must have been purchasers at such sales. This being so, the grant when finally made inured to the benefit of Chapman rather than Wolsey. Neither took title from the State at first, and as the final grant from the United States was in legal effect to Chapman or his grantors, he has the right to have that fact declared by a judicial decision against Wolsey, who sets up his adverse claim.

3. As to the alleged *bona fide* purchase of Wolsey.

This has been substantially disposed of by what we have already said. He purchased under the school-land grant. His patent so in terms declares. Consequently he cannot be a purchaser under the river grant, to confirm which, as has been seen, the legislation of 1861 and 1862 was had.

4. As to the adjustment of 1866.

We are clearly of the opinion that this adjustment settled no

rights as between any other parties than the State and the United States. The conflicting claimants were not parties to that settlement. The agent of the State was instructed not to relinquish the claim of the State under the school-land grant, and he did not do so. The United States simply applied themselves to the adjustment of quantities under all the grants, and whenever they did speak were careful to say that nothing which was done should be construed as affecting adversely any existing rights. The result was to leave the whole question to the ultimate determination of the courts.

5. As to the right of the governor to convey the lands in question to the Des Moines Company under the joint resolution of March 22, 1858, authorizing a conveyance upon settlement with the company.

The original contract between the State and the company contemplated a conveyance of all the river-grant lands not sold by the State on the 23d of December, 1853. This should be construed in the light of the fact that the act making the river grant provided for sales of the granted lands to furnish the means of making the required improvement, and if this contract stood alone, we should have no hesitation in holding that the sales referred to were such as had been made in the execution of the trust under which the lands were held, but if there could be any doubt on that subject, the resolution which authorized the settlement removes all grounds for discussion. By that resolution, all the lands which had before that time been approved and certified to the State under the river grant were to be conveyed to the company, excepting such as had been sold or agreed to be sold by the officers of the State prior to Dec. 23, 1853, " under said grant." The land now in controversy had been so certified, and it had also been sold under that grant. Therefore, the governor was expressly authorized to include it in his conveyance.

This disposes of all the questions urged upon our consideration, and the decree of the court below is consequently

*Affirmed.*