**A. E. STAKEMANN, Plaintiff**

v.

**HANS P. OLSEN, Defendant**

January Term, 1924

No. 44

District Court of the Virgin Islands

Christiansted Sub-Judicial District
Saint Croix

February 29, 1924

McKEAN, *Judge*

(1) At common law and in equity, the owner of property offered by sale at auction has the right to prescribe the manner, conditions and terms of sale; and when these are read and made known the purchaser cannot acquire a title in opposition to them against the consent of the owner. 2 Mechem on Sales (2nd ed.) 211; McManus v. Fortesque (1907) 2 K.B. 1; Farr v. John, 23 Iowa 288, 92 Am. Dec. 426; Miller v. Baynard, 2 Houst. (Del.) 559, 83 Am. Dec. 168; Ashcom v. Smith, 2 Pen. & W. (Pa.) 211, 21 Am. Dec. 437; Miller v. Law, 10 Richardson's Equity 320, 73 Am. Dec. 92.

The law of Denmark and the Virgin Islands is the same. — I. Nellemann Treatise on Execution and Auction 358 et seq.

Auction sales are of very ancient origin. We read in Milton and Gibbon how the ground upon which Hannibal was encamped at the time on the banks of the Anio, was sold at an auction conducted in Rome. The word "auction" is said to be derived from the Latin word "auctio," signifying increase, because of the belief that it was the best method of obtaining a good price. Methods of bidding differ. For example, in Holland (and possibly in New York and Delaware under the Dutch regime) the method pursued is to put up the property offered for sale at a price greater than expected and then to gradually lower the price until some one closes the sale

by accepting the offer and thus becoming the purchaser. In a Kentucky case (Tyree v. Williams, 3 Bibb (Ky.) 365, 6 Am. Dec. 663), a bid by letter was held valid.

In Denmark and St. Croix the method is different from that obtaining in the United States. This is shown by the terms of sale in the present case, Paragraph 2 of the "Conditions of Sale" being: "Besides the bid the purchaser shall pay 15% of the bid, without curtailment in this." This means that a nominal bid of $1 is an actual bid of $1.15.

Plaintiff procured a public auction of chattels, to be held August 4, 1923, in the town of Christiansted. One of the "Conditions of Sale," read at the outset, was the one already quoted. The defendant, a successful bidder, contending that the law limits the amount payable at the rate of 12 1/2 per centum above the nominal amount of the bid under an Executive Order of August 4, 1922, refused to pay more than said amount. He makes numerous citations in support of his position, among them the Royal Resolution of September 29, 1848, regarding the recently emancipated Negroes, various Ordinances fixing fees, taxes and other expenses of sales by auction, the Act of Congress (Mar. 3, 1917, ch. 171, 39 Stat. 1132; 48 U.S.C. §§ 1391, 1392, 1394-1396; prec. 1 V.I.C.) providing for the Government of these Islands, and the Colonial law (Apr. 6, 1906; prec. 1 V.I.C.) conferring upon the courts authority to pass judgment on any question relating to the extent of the power vested in the Administrative Authorities.

(2) The Act of Congress of March 3, 1917, entitled "An Act to Provide a Temporary Government for the West Indian Islands Acquired by the United States from Denmark, etc." (supra), is in substance, though not in terms, the local Constitution of these Islands. In the enacting clause it is provided: "That, except as hereinafter pro-

vided, all military, civil and judicial powers necessary to govern the West Indian Islands acquired from Denmark shall be vested in a Governor and in such person or persons as the President may appoint, and shall be exercised in such manner as the President shall direct until Congress shall provide for the Government of such islands." Section 2 of the said Act (39 Stat. 1132; 48 U.S.C. § 1392; prec. 1 V.I.C.) provides: "That until Congress shall otherwise provide, insofar as compatible with the changed sovereignty and not in conflict with the provisions of this Act, the laws regulating elections and the electoral franchise as set forth in the Code of laws published at Amalienborg the Sixth Day of April, Nineteen Hundred and Six, and the other local laws in force and effect in said Islands, and the same shall be administered by the civil officials and through the local tribunals established in said Islands, respectively, and the orders, judgments and decrees of said judicial tribunals shall be duly enforced. With the approval of the President, or under such rules and regulations as the President may prescribe, any of the said laws may be repealed, altered or amended by the Colonial Council having jurisdiction. * *. * "

■ ■ It is clear from a reading of this Act (Mar. 3, 1917, supra) that legislation in force in these Islands can only be altered, amended or repealed by legislative authority, either the Colonial Council having jurisdiction or the Congress of the United States. Executive orders, rules and regulations are very useful instrumentalities of government; without them the maintenance of law and order would be difficult, if not impossible. They cannot be used, however, for purposes of legislation, and where such has been attempted it generally, perhaps always, has been through inadvertence.

In form there have been very few cases passing upon

the validity of official acts of the President of the United States, the reason being that many executive acts are promulgated by heads of various executive departments, such as the Treasury, War, Navy, and Interior Departments; but the acts of heads of departments, within the scope of their powers, are in law the acts of the President. Wilcox v. Jackson, 13 Peters 498, 10 L. Ed. 264; Wolsey v. Chapman, 101 U.S. 755, 25 L. Ed. 915; United States v. Farden, 99 U.S. 674, 25 L. Ed. 267.

In the case of United States v. Symonds (Symonds v. United States, 21 Ct. Cls. 148), the Secretary of the Navy issued an order to the effect that certain specified training ships would not be considered in commission for sea service. The appellee and plaintiff was the executive officer of a training ship anchored in Narragansett Bay, subject to such regulations as would be enforced at sea. The Secretary's order reduced his pay from sea-pay to shore-pay. The Court of Claims held that the plaintiff was entitled to sea-pay. This conclusion was affirmed by the Supreme Court of the United States in (United States v. Symonds) 120 U.S. 46, 7 S. Ct. 411, 30 L. Ed. 557. Mr. Justice Harlan, in delivering the opinion of the Court, used the following language with reference to executive orders: "The authority of the Secretary to issue orders, regulations and instructions, with the approval of the President, in reference to matters connected with the naval establishment, is subject to the condition, necessarily implied, that they must be consistent with the statutes which have been enacted by Congress in reference to the Navy. He may, with the approval of the President, establish regulations in execution of, or supplementary to, but not in conflict with, the statutes defining his powers or conferring rights upon others."

The case of United States v. Symonds (supra) has been followed, with approval, by the Supreme Court of the

53

United States in a number of decisions. In one of them, United States v. Strong, 125 U.S. 656, 8 S. Ct. 1021, 31 L. Ed. 823, it was decided that a Lieutenant Commander of the U. S. Navy, performing duty as an executive officer, on board a receiving ship at Boston, under an order designating his employment as "shore-duty," is entitled to receive pay for sea-service. In like manner, it was decided in the case of United States v. Barnette, 165 U.S. 174, 17 S. Ct. 286, 41 L. Ed. 675, that a Lieutenant in the Navy is entitled to pay for sea-service while on board a vessel of the United States anchored at and tied to a wharf in New York Harbor, on which a nautical school is maintained in which he acts as an instructor, when the vessel is furnished by the Secretary of the Navy who assigns the Lieutenant to such duty and the latter receives no orders except from the Captain of the vessel, although the service is called by the Secretary of the Navy "employment on shore duty," and the Lieutenant receives pay also as instructor from the State of New York.

To the same effect are the cases of Morrill v. Jones, 106 U.S. 466, 1 S. Ct. 423, 27 L. Ed. 267; Iselin v. Hedden, 28 Fed. 416; Balfour v. Sullivan, 19 Fed. 578; and United States v. Goodall, 84 Fed. 155. In Morrill v. Jones (supra), the Supreme Court of the United States, in an opinion delivered by Mr. Chief Justice Waite, held that "The Secretary of the Treasury cannot by his regulations alter or amend a revenue law. In our opinion, the object of the Secretary could only be accomplished by an amendment of the law. That is not the office of a treasury regulation." Balfour v. Sullivan (supra) held that the power of the Secretary of the Treasury to prescribe rules and regulations does not authorize him to impose a duty, not provided for by Congress, in payment of a drawback. Iselin v. Hedden (supra) decided that the Treasury De-

partment has no power to add to the law by imposing charges on importers. In the case of United States v. Goodall (supra), it was held that an executive regulation could not be enforced when it infringes upon a statute.

■ It will thus be seen that under the American system the executive has no inherent power to legislate. The Act of Congress providing for the government of these Islands (March 3, 1917, supra) continued the laws in force "insofar as compatible with the changed sovereignty." The defendant cites the Royal Resolution of September 29, 1848, as investing the Governor with legislative powers. The Resolution in question is published in the old official Danish language. It consists of instructions to P. Hansen, Governor-General ad interim of the Danish Islands of the West Indies, following closely upon the social upheaval arising from the abolition of slavery. Paragraph 3 of said instructions is, as follows: "As soon as he (the temporary Governor-General) has acquired the necessary knowledge of conditions in the Island it shall be his duty to establish the relations between employers and laborers in the Country and in the Towns and to secure permanent labor for long periods by provisional Ordinances, in drafting of which it will seem advisable to follow the laws regarding servants and vagrants in force in the Fatherland, as far as such laws will apply to local conditions; it is also deemed advisable for the said purpose to establish contracts executed in writing before a Magistrate. Furthermore, it is deemed advisable to impede the emigration of the laborers from the Islands by just and equitable legislation and Executive Orders." These were the instructions of an absolute monarch, Frederik VII. The same King, by promulgating the "Grundloven" (or Fundamental Law), of June 5th, 1849, abolished "Kongeloven" or King-made laws. Since that time, such changes as have been made in the

laws regarding fees and taxes have been made by or under legislative authority. As an instance of this see the Ordinance of the Danish West Indies Islands of 17 April, 1909, Concerning Some Regulations Relative to Enforced Auction, in which the fee of "the lawyer of requester," is fixed in a limited class of cases.

■ Part 1, Section 6, of the Colonial Law for the Danish West India Islands of April 6, 1906 (prec. 1 V.I.C.), provides, in part, that "The Courts of Justice are authorized to pass judgment on any question relating to the extent of power vested in the administrative Authorities."

■ Coming to the Executive Order of August 4, 1922, cited by the defendant, the pertinent parts read: "Rules and Regulations concerning Auction Sales and the granting of Licenses as Auctioneer in the Virgin Islands of the United States of America." * * *

"4. For defraying expenses, auction fees, and dues, as well as for collection, the auctioneer can charge the vendor, or purchaser, with 12 1/2 per centum of the purchase sum, at the highest, (four per cent of the gross purchase sum plus costs of auction, and one per cent of the gross purchase sum alone, are to be turned in to the Colonial Treasury.).

"5. With regard to dues for auction fees, and other percentage fees, the rules contained in Regulations issued January 7, 1868, for fees for the Reconciling Department, the Judiciary Department, and the functions therewith connected in the former Danish West India Islands, now the Virgin Islands of the United States, shall be followed."

The references to "Regulations issued January 7, 1868," is in reality to the Ordinance of January 7, 1868, sanctioned by Royal Resolution of October 5th, 1870, which is purely legislative, and not executive. As an executive order, the "Rules and Regulations concerning Auction Sales," etc.,

of August 4th, 1922, fix the maximum charges which an auctioneer may make for his services. By custom, recognized in legislation, the Governor has the power to fix such charges whenever he grants a license to an auctioneer. Tax rates are not within such power, being fixed by law. The auction sales tax is fixed by law at 4 per centum. The purchase price is the nominal bid plus the percentage added by the "Conditions of Sale." In the present case the seller has assumed the responsibility of paying all taxes, fees and charges. As a general rule the fees for auctions are payable by the party requiring auctions, "who, in case the vendue-master considers it necessary, shall furnish security for the probable amount of all the fees as well as the auction-fees as the other percentage-fees." Ordinance of January 7, 1868 (sanctioned October 5th, 1870), Regulating Fees, sect. 69.

The defendant seems to have misconceived the purpose of the Executive Order, cited by him, as it has no bearing upon the "Conditions of Sales" of an auction, but is intended to limit the charges of an auctioneer.

In accordance with these views, the defendant has been found liable for the full amount of his bid, in accordance with the "Conditions of Sales," together with interest and costs.