UNITED STATES *v.* BATEMAN.

*(Circuit Court, N. D. California.    March 5, 1888.)*

1. COURTS — FEDERAL — JURISDICTION—HOMICIDE—WITHIN PRESIDIO MILITARY RESERVATION.

   The Presidio military reservation, in the city and county of San Francisco, is not a place "under the exclusive jurisdiction of the United States;" and a homicide committed within the reservation is not an offense against the United States, within the meaning of section 5339, Rev. St.

2. SAME.

   A homicide committed within said Presidio military reservation is not an offense over which the courts of the United States have jurisdiction.

*(Syllabus by the Court.)*

Indictment of Thomas N. Bateman for the murder of Samuel M. Soper, first sergeant of troop A, Second cavalry, U. S. A., stationed at the Presidio military reservation.

*J. T. Carey*, U. S. Atty., for the United States.

*Mitchell & Donnelly*, for defendant.

Before SAWYER, Circuit Judge, and HOFFMAN, District Judge.

SAWYER, J., (HOFFMAN, J., *concurring.*)   The defendant is indicted for the murder of Samuel M. Soper, alleged to have been committed on July 5, 1887, within the limits of the military reservation situate within the city and county of San Francisco, and known as the "Presidio." The indictment is found under section 5339, Rev. St., which provides for punishing a murder committed "within any fort, arsenal, dock-yard,

magazine, or in any other place, or district of country, under the exclusive jurisdiction of the United States." The defendant pleads that the place where the murder is alleged to have been committed, is not within the exclusive jurisdiction of the United States; or within the jurisdiction of the United States; and that the offense charged is not an offense against the laws of the United States, within the meaning of the statute; or an offense over which the circuit court has jurisdiction. The admitted facts upon which the decision must depend are as follows: The place where the offense is alleged to have been committed, is within the limits of a military reservation of the United States, situate within the city and county of San Francisco, known as the "Presidio," as it was at the time of the commission of the offense, bounded, surveyed, and established, and actually occupied, by the United States for military purposes, having upon it garrisons, officers' and soldiers' quarters, forts, fortifications, etc., in actual use and occupation for military purposes by officers and soldiers of the regular army of the United States. For 35 years prior to the treaty between Mexico and the United States, by which California, including the land in question, was ceded to the United States, and up to the time of their occupation by the United States, the lands within this reservation had been occupied by Mexico as a military reserve, having upon it forts, garrisons, and appurtenances, occupied by Mexican troops for military purposes; and, continuously, from the surrender of these premises by the Mexican forces to the United States down to the present time, they have in like manner been occupied for like purposes by the military forces of the United States. These lands, with all other lands of the state of California, were ceded to the United States by Mexico by the treaty of Guadaloupe Hidalgo, of February 2, 1848. On June 23, 1848, prior to the organization of the state government of California. and while under the exclusive sovereignty and jurisdiction of the United States, Capt. J. L. Folsom, assistant quartermaster U. S. A., in compliance with instructions given by B. Riley, brigadier general U. S. A., and military governor of California, dated March 29, 1848, established the boundaries of the said military reservation, which boundaries included the point where the homicide is alleged to have been committed. Afterwards, on November 30, 1848, on the recommendation of the president, a joint commission of navy and engineer officers was appointed for the purpose of examining the coast, with a view to selecting military reservations. Said commissioners, on March 31, 1850, recommended the reservation of the Presidio, with boundaries including the point where the homicide is alleged to have been committed. Thereafter, on November 6, 1850, Millard Fillmore, president of the United States, by an executive order, exempted and reserved from sale, for public services, the last-mentioned tract. Afterwards, by an executive order issued by Millard Fillmore, president of the United States, dated December 31, 1851, which order was confirmed by an act of congress approved May 9, 1876, the boundaries of said reservation were somewhat modified, but they still, and at all times, included the point at which said homicide is alleged to have been committed. On September 9, 1850, California was,

by act of congress, admitted as a state into the Union, "on an equal footing with the original states in all respects whatever." There was no reservation of sovereignty over any part of the public lands. The only condition was that there should be no "interferences with the primary disposal of the public lands within its limits," and that the state "shall pass no law and do no act whereby the title of the United States to, and right to dispose of, the same shall be impaired or questioned; and that they shall never lay any tax or assessment of any description whatsoever upon the public domain of the United States." 9 St. 452. The only act of the legislature of California brought to the attention of the court, that can possibly be regarded as affecting the question is the act of April 27, 1852, which provides "that the consent of the legislature of California be and the same is hereby given to the purchase by the government of the United States, or under the authority of the same, of any tract, piece, or parcel of land from any individual or individuals, bodies politic or corporate, within the boundaries or limits of this state, for the purpose of erecting thereon armories, arsenals, forts, fortifications, navy-yards, or dock-yards, magazines, custom-houses, light-houses, and other needful public buildings or establishments whatsoever; and all deeds, conveyances, or title papers for the same shall be recorded as in other cases, upon the land records of the county in which the land so conveyed may lie; and in like manner may be recorded a sufficient description, by metes and bounds, courses and distances, of any tract or tracts, legal divisions or subdivisions, of any public land belonging to the United States, which may be set apart by the general government, for any or either of the purposes before mentioned, by an order, patent, or other official document or paper so describing such land. The consent herein and hereby given being in accordance with the seventeenth clause of the eighth section of the first article of the constitution of the United States, and with the acts of congress in such cases made and provided." St. 1852, p. 149. 1 Hitt. Code, § 4215. At the time the homicide is alleged to have been committed, no description by metes and bounds, or otherwise, had been recorded upon the land records of the city and county of San Francisco, as provided for in the latter part of the section quoted. The deceased, Samuel M. Soper, was at the time of his death, and he had been for some time prior thereto, first sergeant of troop A, Second cavalry, U. S. A., stationed at the Presidio. The defendant was at the same time a private in the same troop, stationed at the same place.

Upon the foregoing state of facts, is the point where the homicide is alleged to have been committed "a place * * * under the exclusive jurisdiction of the United States?" We do not think it is, and not being so, the act is not an offense against the United States, within the meaning of section 5339, Rev. St., or an offense over which the United States courts have jurisdiction. This point is authoritatively determined by the supreme court of the United States in the late case of *Railroad Co.* v. *Lowe,* 114 U. S. 525, 5 Sup. Ct. Rep. 995. In that case the reservation at Fort Leavenworth was situate precisely like that at the Presidio, at the time of the admission of Kansas into the Union. Says the court:

"The land constituting the reservation was part of the territory acquired in 1803 by cession from France, and, until the formation of the state of Kansas, and her admission into the Union, the United States possessed the rights of a proprietor, and had political dominion and sovereignty over it. For many years before that admission it had been reserved from sale by the proper authorities of the United States, for military purposes, and occupied by them as a military post. The jurisdiction of the United States over it during this time was necessarily paramount. But in 1861 Kansas was admitted into the Union upon an equal footing with the original states; that is, with the same rights of political dominion and sovereignty, subject like them only to the constitution of the United States. Congress might undoubtedly, upon such admission, have stipulated for the retention of the political authority, dominion, and legislative power of the United States over the reservation, so long as it should be used for military purposes by the government; that is, it could have excepted the place from the jurisdiction of Kansas, as one needed for the uses of the general government. But from some cause,—inadvertence perhaps or over confidence that a recession of such jurisdiction could be had whenever desired,—no such stipulation or exception was made. The United States therefore retained, after the admission of the state, only the rights of an ordinary proprietor."

These observations are as applicable to the Presidio as to the Fort Leavenworth reservation, as will be seen by reference to the act admitting California. The only reservation relating to the public land affected the proprietary interest of the United States in the lands. That interest was to be in no way interfered with. There was no reservation whatever as to sovereignty, or governmental powers or jurisdiction. There was no distinction made in the act of admission between these lands and other lands constituting the public domain in California. There being no reservation of governmental powers or jurisdiction over the Presidio lands in the act admitting California into the Union, in the language of the supreme court in the case cited, "the United States, therefore, retained, after the admission of the state, only the rights of an ordinary proprietor." And again, says the court:

"The consent of the states to the purchase of lands within them for the special purposes named is, however, essential, under the constitution, to the transfer to the general government, with the title, of political jurisdiction and dominion. Where lands are acquired without such consent, the possession of the United States, unless political jurisdiction be ceded to them in some other way, is simply that of an ordinary proprietor."

The United States were both proprietors and sovereigns of the Presidio lands till the admission of the state of California into the Union. By the act of admission, reserving only their proprietary right over these lands, they relinquished to the state their governmental or local sovereign right, and jurisdiction, and were thenceforth only proprietors in the sense that any natural person owning land is a proprietor. Having so relinquished their sovereign rights, that condition remains to this day, unless the state has in some way, either directly or by implication, receded to the United States its sovereign jurisdiction. This could be done by direct cession, or by consenting through its legislature to the purchase of land for such governmental purposes, and a purchase for such purposes in pursuance of such consent. Neither has been done in this in-

stance. There is no act directly ceding the jurisdiction. By the act of 1852, as we have seen, the legislature in the proper form consented that the United States might purchase lands for certain specific purposes, including military purposes. But these lands were not so purchased. They were owned by the United States before California became a state, and by her admission into the Union the sovereignty was relinquished. That sovereignty was not receded by the consent of the state to the purchase of other lands for similar purposes. The cession of exclusive jurisdiction over these lands is not within the purview of the act. The act, it is true, in another provision, authorizes the recording of a description by metes and bounds, or other definite description in the land records of the county "of any public lands belonging to the United States, which may be set apart by the general government, for any or either of the purposes before mentioned, by an order, patent, or other official document or paper so describing such land." But the purpose or effect of such recording is not prescribed. It may have been intended only for the purpose of affording record evidence of title, as in the case of records of title in parties. There is no statement of a purpose, direct or by implication, to divest the state of its sovereignty over the lands so described and recorded by such record. It is doubtful, at least, whether such a record under this act would have that effect. Such effect should not be given the record, unless that be clearly the purpose of the legislature. But it is unnecessary to determine the effect of such a record now, as none whatever had been made at the time of the alleged commission of the homicide charged. Nothing had then been done under any provision of this act. A subsequent record could not have the effect to now make that act an offense against the United States which was not an offense at the time the act was performed.

We know of no other act of the state of California, through its legislature or otherwise, by which a retrocession of its sovereign jurisdiction over the Presidio military reservation has been made to the United States. The result is, the Presidio reservation is not within the exclusive jurisdiction of the United States, and the acts charged do not constitute an offense against the United States under section 5339, Rev. St., or of which this court has jurisdiction. The indictment must, therefore, be quashed on that ground, and it is so ordered.