## UNITED STATES v. TULLY.

(Circuit Court, D. Montana. September 23, 1905.)

1. CRIMINAL LAW—JURISDICTION OF FEDERAL COURTS—CRIMINAL OFFENSES—COMMISSION ON MILITARY RESERVATION.

To give a federal court jurisdiction to try a person for a criminal'offense, on the ground that it was committed within a fort or military reservation, such fort or reservation must have been established by law, as contemplated by Const. art. 1, § 8, either by purchase with the consent of the Legislature of the state or by reservation of public lands therefor by compact with the state at the time of its admission, and exclusive jurisdiction over the same must have been reserved to the United States, either by express words or by necessary implication.

2. SAME—LANDS OCCUPIED BUT NOT LEGALLY RESERVED FOR MILITARY POST.

By executive orders certain public lands in the then territory of Montana were reserved by the President for military purposes, under the designation of "Ft. Missoula Military Reservation." It was subsequently ascertained that most of the buildings of the post were upon the E. ½ of section 36 adjoining the lands reserved, which had already been reserved by the organic act governing the organization of the territory for the use of the state, when admitted, for school purposes. By order of the General of the Army the commander of the post continued to occupy and exercise authority over such land, but no action was ever taken by Congress or the President to legally include the same in the lands reserved for military purposes; but both subsequently acted on the understanding that it was not a part of the reservation. The Constitution of the state of Montana (article 2, § 1) acknowledges the authority of the United States to exercise exclusive legislation, as provided by the federal Constitution over the military reservations in the state, including Ft. Missoula "as now established by law," and the enabling act under which the state was admitted reserved from the grants made all lands "embraced in Indian, military or other reservations of any character." *Held*, that no part of section 36 was within the reservation "as established by law," nor within the reservation of the enabling act, and that the federal court was without jurisdiction to try a person for a homicide committed on the part of said section occupied by the United States as a part of its military post, which by the organic act and the subsequent admission of the state passed to the state and under the jurisdiction of its courts.

3. COURTS—FOLLOWING STATE DECISION.

The rule that the construction of the Constitution or laws of a state by its Supreme Court is binding upon the federal courts does not apply, where such construction affects the jurisdiction of a federal court, which is under the duty of determining such matter for itself.

[Ed. Note.—State laws as rules of decision in federal courts, see notes to Wilson v. Perrin, 11 C. C. A. 71; Hill v. Hite, 29 C. C. A. 553.]

Indictment for Murder. On plea to jurisdiction.

Carl Rasch, U. S. Atty.

E. E. Hershey and Word & Word, for defendant.

WHITSON, District Judge. On the 7th day of November, 1903, the defendant was informed against in the Fourth judicial district court of the state of Montanà, county of Missoula, for the murder of Thomas Kennedy, alleged to have been committed in said county on the 18th day of October, 1903, and upon trial in said court, he was convicted of murder in the first degree. Judgment upon the verdict of the jury was entered, and defendant was accordingly sentenced to

be hung. Upon appeal to the Supreme Court of the state the judgment of the lower court was reversed, upon the ground that the homicide was committed upon what it found to be the Ft. Missoula military reservation, which was held to be a place under the exclusive control of the United States; the jurisdiction, therefore, being in the federal courts, and not in those of the state. State v. Tully (Mont.) 78 Pac. 760. The defendant, having been discharged, was apprehended by the federal authorities, held to answer, and afterwards, on the 29th day of April, 1905, an indictment was returned against him in this court, which charges that the crime was committed on Ft. Missoula military reservation, alleged to be a place under the sole and exclusive jurisdiction of the United States. Defendant meets the indictment with a plea to the jurisdiction. In the state court he contended for the jurisdiction of this court, and here contends for that of the state court. A man being tried for his life, of course, is not squeamish as to consistency, and, as its power is directly challenged, it is for this court to decide, as did the Supreme Court of Montana, whether it has authority to try the offense charged in the indictment.

An answer has been filed to the plea of the defendant, to which a demurrer has been interposed, but the facts are fully set out, and, as admitted by the plea and answer, are sufficient to enable the court to pass upon the questions presented. The homicide was committed on the E. $\frac{1}{2}$ section 36, township 13 N., of range 20 W. At the time, that portion of said section was being occupied by the government for military purposes; part of the buildings of Ft. Missoula were situated thereon, and both the deceased and the defendant were enlisted soldiers in service, and in charge of the commandant of the post, who was exercising control of this particular tract, as well as other lands, admitted to be a part of this reservation. If the act was committed upon a military reservation of the United States, the site for which had been purchased by the general government within the state, by consent of its Legislature, under article 1, § 8, of the federal Constitution, then it is a place within the exclusive jurisdiction of the United States, the obvious meaning of the words "exclusive legislation," as used in the article being equivalent to "exclusive jurisdiction." United States v. Cornell, Fed. Cas. No. 14,867. Or, if the act was committed in a place where upon the admission of Montana into the Union, the right to exclusive legislation was reserved by the general government in its compact with the state, under section 5339, Rev. St. [U. S. Comp. St. 1901, p. 3627], it is punishable in this court. United States v. Bateman (C. C.) 34 Fed. 86; Fort Leavenworth R. R. Co. r. Lowe, 114 U. S. 531, 5 Sup. Ct. 995, 29 L. Ed. 264; Benson v. United States, 146 U. S. 329, 13 Sup. Ct. 60, 36 L. Ed. 991; United States v. Tichenor (C. C.) 12 Fed. 415. No purchase of land had been made within the state for military purposes for use at Ft. Missoula, at the time of the killing, and the jurisdiction must depend therefore upon whether these lands had been legally set aside as a part of said reservation, and, if so, whether exclusive jurisdiction was reserved over them at the time of the admission of the state, either by express words or necessary implication.

For a solution of this matter we must ascertain how a military reservation may be established. If none ever was established which included this place, this court has no jurisdiction; if one was established and devoted to military purposes, and the exclusive jurisdiction of the general government not reserved, the jurisdiction is in the state courts. Clearly Congress has full power to reserve from sale, or set aside, any portion of the public domain for military or other governmental purposes, and it may by appropriate legislation, authorize the President to exercise this power. In Wilcox v. Jackson ex dem. McConnel, 13 Pet. 512, 10 L. Ed. 264, it was held that the power conferred upon the President by the act of Congress of June 14, 1809, authorizing him to erect fortifications for the northern and western frontiers, gave him authority to make reservation of public lands for military posts; it was said:

"We thus see that the establishing trading houses 'with the Indian tribes, and the erection of fortifications in the west, are purposes authorized by law; and that they were to be established and erected by the President. But the place in question is one at which a trading house has been established, and a fortification or military post erected. It would not be doubted, we suppose, by anyone, that if Congress had by law directed the trading house to be established and the military post erected at Ft. Dearborn, by name, that this would have been by authority of law. But instead of designating the place themselves, they left it to the discretion of the president, which is precisely the same thing in effect. Here then is an appropriation, not only for one but for two purposes, of the same place, by authority of law."

The Supreme Court, at a later date, had occasion to consider this subject in Grisar v. McDowell, 6 Wall. 381, 18 L. Ed. 863, where it expressed itself as follows:

"From an early period in the history of the government it has been the practice of the President to order, from time to time, as the exigencies of the public service required, parcels of land belonging to the United States to be reserved from sale and set apart for public uses." "The authority of the President in this respect is recognized in numerous acts of Congress."

Turning, now, to the history of Ft. Missoula military reservation, we find it to be as follows: By executive order of February 19, 1877, all of section 31, township 13 N., range 19 W., containing 640 acres, was set apart as a military reservation, under that designation. Upon August 5, 1878, said reservation, by executive order, was increased by adding thereto 560 acres in section 30, township 13 N., range 19 W. On August 27, 1878, the post commander at Ft. Missoula reported by letter his discovery that most of the buildings of the post were located on the east half of section 36. In response thereto, the following letter was written:

"Headquarters of the Army, Adjutant General's Office.
"Washington, Dec. 5, 1878.
"To the Commanding General, Department of Dakota, Through Headquarters Division of Missouri—Sir: Referring to your endorsement of the 26th ultimo upon communication from the commanding officer at Ft. Missoula, Montana Territory, who invites attention to his letter of August 27, 1878, relative to the necessity of securing to military uses the East ½, at least, of section 36, township 13 N., range 20 west, Helena Land Dist., reserved for school purposes, I am instructed by the General of the Army to inform you that the Secretary of War will apply to Congress for the use of said school

section in connection with the military reservation of Ft. Missoula, and that meantime the commanding officer of the post may prevent intrusion on the reservation as declared, as also upon the school section, the title to which still remains in the United States.

"I am, sir, very respectfully, your obedient servant,

"E. D. Townsend, Adjutant General."

It will be observed that neither by act of Congress, nor by authority of the President, was said section ever set apart as a part of said reservation; that the President did not through the Secretary of War, or otherwise, in fact, reserve or attempt to reserve this land for military purposes. These being the only methods by which it could have been set aside, it must be held that section 36 was not, at the time of the admission of the state, a part of said military reservation, and it was not, therefore, a place within the exclusive jurisdiction of the United States.

The United States attorney has ably and zealously contended for the power of this court to try the defendant. His contention is that the President in matters of this kind may act through the head of a department, and when an order for a reservation of the character of that under discussion has been made, the presumption attends it that it was by his authority; and this is well settled. Wolsey v. Chapman, 101 U. S. 755, 25 L. Ed. 915; Scott v. Carew, 196 U. S. 109, 25 Sup. Ct. 193, 49 L. Ed. 403; United States v. Tichenor (C. C.) 12 Fed. 415. The argument is that the action of the General of the Army, in directing the officer in charge to keep trespassers off, is of itself, in effect an order setting aside this section. If we may judge of the letter by the language used, we are compelled to arrive at a different conclusion. Passing over the contention that the General of the Army had power without authority from the Secretary of War to reserve any part of this section as untenable, as decided in United States v. Tichenor (C. C.) 12 Fed. 415, it is manifest that the secretary, in so far as his intention is disclosed, considered he had no power to reserve this land for military purposes, on account of the same being a school section. The fact that he called it to the attention of Congress from time to time indicates that, in his opinion, it was a matter only for congressional action. In addition to this, we have the further construction of the executive branch of the government, and by Congress also, in an act approved March 19, 1904 (33 Stat. 142, c. 718) which is as follows:

"An act to authorize the Secretary of War to accept from the citizens of Missoula, Montana, deeds donating to the United States certain lands for the enlargement of the military reservation of Ft. Missoula, Montana.

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, that the Secretary of War is hereby authorized to accept from the citizens of Missoula, Montana, deeds donating to the United States, the following described lands for the enlargement of the military reservation of Ft. Missoula, namely: The south half of the southwest quarter of section twenty-five, the northeast quarter of section thirty-five, the northeast quarter, the north half of the southeast quarter, and the north half of the northwest quarter of section thirty-six, all in township thirteen north and range twenty west of the Montana meridian in Missoula county, Montana."

Pursuant to the provisions of this act, the citizens of Missoula, deriving their title from the state by virtue of its grant of school lands

from the general government, tendered a deed to the United States for that part of section 36, upon which the homicide was committed, the acceptance of which is held in abeyance, pending the final determination of the questions involved in this case.

It has been argued that the decision made by the Supreme Court of Montana, being a construction of its own Constitution, falls within the rule that the federal courts are bound by the decisions of the highest court of a state, in construing its Constitution and laws, and that this court is concluded by that decision. But the organic act creating the territory, and the enabling act, under which Montana became a state, are federal statutes. Besides, I do not understand the rule to extend to jurisdictional matters. The courts of a state cannot, by their decisions, settle the jurisdiction of the federal courts. Again, a decision of the question involves a construction of the Constitution and laws of the United States, and a grant made by the United States, and it would be an anomaly to say that the decision of a state court could extend, limit, or define the powers of the federal government to the exclusion of the jurisdiction of its own courts. Such a doctrine would amount to a complete surrender of its sovereignty. It is an inherent power in every court to decide as to its own jurisdiction. A long line of precedents may be found in the Supreme Court Reports, where that court has repeatedly passed upon questions involving the identical and points similar to those in controversy, and its power in that regard has never been questioned.

In further aid of the jurisdiction here, it has been argued that the compact made between the federal government and the state of Montana, upon the admission of the latter into the Union, was broad enough to reserve to the United States whatever was actually being occupied as a part of said military reservation. That contention is based upon the enabling act and upon section 1, art. 2, of the Constitution of Montana, which in part reads as follows:

"Authority is hereby granted to and acknowledged in the United States to exercise exclusive legislation as provided by the Constitution of the United States, over the military reservations of Fort Assinaboine, Fort Custer, Fort Keogh, Fort Maginnis, Fort Missoula," etc., "as now established by law, so long as said places remain military reservations, to the same extent and with the same effect as if said military reservations had been purchased by the United States by consent of the Legislative Assembly of the state of Montana."

Section 10 of the enabling act, under which Montana was admitted (Act Feb. 22, 1899, c. 180, 25 Stat. 679), provides, among other things:

"Nor shall any lands embraced in Indian, military, or other reservations of any character, be subject to the grants or to the indemnity provisions of this act until the reservation shall have been extinguished and such lands be restored to, and become a part of, the public domain."

It is insisted that by the use of the words "reservations of any character" it was meant to reserve to the United States such reservations as were being occupied whether lawfully established or not, and that the general government and the state, with full knowledge of the manner in which Ft. Missoula reservation was being occupied, are presumed to have entered into the compact with this in view; the general government intending to retain its jurisdiction over what was in actual

occupation, and the state to waive its jurisdiction over such occupancy. Waiving the question as to whether the words "of any character" apply to military reserves at all, it may be remarked that the article of the Constitution is more explicit, because it refers to reservations "as now established by law," and we have seen that section 36 was not established as a part of Ft. Missoula reservation by law, but that it was occupied without authority of law; and in construing the language in section 10 of the enabling act, we must conclude that it was intended to refer to reservations established by law. Indeed, if this reservation was not established by law, it was not established at all. If occupancy alone, under such circumstances, constitutes a segregation of land from the public domain, then there was neither necessity for executive order nor congressional action, and it was within the power of the General of the Army or an officer inferior in rank to usurp the powers both of Congress and the executive.

But there is another insuperable objection to the retention of this cause. The organic act reserved this section for school purposes. Act May 26, 1864, c. 95, 13 Stat. p. 91. Section 14 of that act reads as follows:

"And be it further enacted that when the lands in said territory shall be surveyed under the direction of the government of the United States, preparatory to bringing the same into the market, sections numbered 16 and 36, in each township in said territory shall be, and the same are hereby reserved for the purpose of being applied to schools in said territory, and in the states and territories hereafter to be erected out of the same."

These lands were surveyed, and the surveys approved in 1870, before any use had been made of the same by the military authorities, which did not begin until 1878. It has long been the policy of the government to set apart certain sections of public lands for the maintenance of schools. Cooper v. Roberts, 18 How. 173, 15 L. Ed. 338. Montana was made no exception to the rule, as we have seen. After the passage of the organic act, sections 16 and 36 in the territory of Montana ceased to be public lands, and they were withdrawn from sale or other disposal under the general laws. Newhall v. Sanger, 92 U. S. 765, 23 L. Ed. 769.

The Supreme Court in Beecher v. Wetherby, 95 U. S. 517–523, 24 L. Ed. 440, considering a grant of school lands to the state of Wisconsin, said:

"It was therefore an unalterable condition of the admission, obligatory upon the United States, that section 16 in every township of the public lands in the state, which had not been sold or otherwise disposed of, should be granted to the state for the use of schools. It matters not whether the words of the compact be considered as merely promissory on the part of the United States, and constituting only a pledge of a grant in future, or as operating to transfer the title to the state upon her acceptance of the propositions as soon as the sections could be afterwards identified by the public surveys. In either case, the lands which might be embraced within those sections were appropriated to the state. They were withdrawn from any other disposition, and set apart from the public domain, so that no subsequent law authorizing a sale of it could be construed to embrace them, although they were not specially excepted. All that afterwards remained for the United States to do with respect to them, and all that could be legally done under the compact, was to identify the sections by appropriate surveys; or if any further assurance of title was required, to provide for the execution of proper instruments to

transfer the naked fee, or to adopt such further legislation as would accomplish that result. They could not be diverted from their appropriation to the State."

To like effect are the following: Minnesota v. Hitchcock, 185 U. S. 390, 22 Sup. Ct. 650, 46 L. Ed. 954; United States v. Thomas, 151 U. S. 583, 14 Sup. Ct. 426, 38 L. Ed. 276; Wilcox v. Jackson, 13 Pet. 498, 10 L. Ed. 264; Fort Leavenworth v. Lowe, 114 U. S. 525, 5 Sup. Ct. 995, 29 L. Ed. 264.

In Cooper v. Roberts, supra, referring to school lands, it was said:

"It will not be supposed that Congress intended to authorize a sale of land which it had previously disposed of. The appropriation of the sections to the state, as already stated, set them apart from the mass of public property which could be subjected to sale by its direction."

The state court denied jurisdiction, if I have apprehended the grounds correctly, upon the theory that the general government never parted with its original sovereignty. But we have seen that by granting lands to the territory for school purposes, the right to dispose of them thereafter, if any such right existed at all, was in Congress alone; that neither the President, nor any other executive officer could appropriate or set them aside for any other purpose; and it must follow that if Congress never acted in the matter, and it is admitted that it did not, the reservation of them in the organic act, followed by the admission of the state, vested full title in the state.

Again, we have seen that the executive branch of the government never undertook to usurp the powers of Congress by way of setting aside these lands for military purposes after the enabling act was passed; and when Montana was admitted into the Union upon the same footing as the original states, whatever the general government did not reserve by way of its political jurisdiction passed to the state, and the fact that political jurisdiction does so pass, furnishes the reason for the compact which is always entered into when a new state is admitted. The general government is one of delegated powers. As to the original states, those powers were actually delegated. As to those admitted afterwards, the powers conceded by the original states in so far as they relate to political jurisdiction, are reserved, or if not reserved, they are lost. A distinction is to be made between the ownership by the United States of lands within the boundaries of a state, which in the absence of express power, it holds as any other landed proprietor, and the ownership coupled with the right to exercise political jurisdiction over such lands.

It was said in Ft. Leavenworth R. R. Company v. Lowe, supra:

"The consent of the states to the purchase of lands within them for special purposes named is, however, essential, under the Constitution to the transfer to the general government, with the title, of political jurisdiction and dominion. Where lands are acquired without such consent, the possession of the United States, unless political jurisdiction be ceded to them in some other way, is simply that of an ordinary proprietor."

It is unfortunate that a murderer should go unwhipped of justice, but it would be yet more unfortunate if any court should assume to try one charged with a crime without jurisdiction over the offense. In this case, in the light of the verdict of the jury in the state court, we

may assume that justice would be done the defendant were he tried and convicted by any court and executed pursuant to its judgment. But in this court it would be the justice of the vigilance committee, wholly without the pale of the law. The fact that the defendant is to be discharged may furnish a text for the thoughtless or uninformed to say that a murderer has been turned loose upon a technicality; but this is not a technicality. It goes to the very right to sit in judgment. To retain this case would be to create jurisdiction by judicial dictum; to enact a law, not to administer it; usurpation of legislative power rather than a construction of the legislative will. It can be said to the honor of the courts, that they have steadfastly adhered to the purposes of their creation and establishment, and that they instinctively shrink from exercising powers not conferred by the Constitution and laws. These sentiments no doubt appealed with equal force to the Supreme Court of Montana, and it is to its credit that it refused to lend its aid to the execution of one for the commission of an act which, in its judgment, was not cognizable under the laws of its state; but I cannot bring myself to the conclusion reached by that able court, and it is upon the judgment and conscience of this court that the matter of jurisdiction here must be decided.

From the views expressed it follows that the plea to the jurisdiction of the court must be sustained, and the defendant discharged, and it is so ordered.