# THE UNITED STATES

*v.*

## ᶠALCADIO BENITEZ HERNANDEZ.

---

### San Juan, No. 356, Criminal.

By the organic act of Porto Rico (April 12, 1900) the local courts were given jurisdiction coterminous with the political boundaries of Porto Rico. The legislature of Porto Rico on February 16, 1903, passed an act giving the United States government exclusive jurisdiction over certain military reservations. Held, that the district court of the United States for Porto Rico has exclusive jurisdiction of offenses committed within said reservation limits.

### Opinion filed August 22, 1906.

---

*N. B. K. Pettingill, Esq.,* District Attorney, for the United States.

*Henry F. Hord, Esq.,* by appointment, attorney for defendant.

*Mr. Frank Feuille,* Attorney General of Porto Rico, *amicus curiæ.*

Rodey, Judge, delivered the following opinion:

United States v. Hernandez.

This cause comes before the court on a motion in arrest of judgment filed by counsel for the defendant. The facts in the case are that on April 24, 1906, an indictment was duly returned into court, on which he was afterwards convicted, charging the defendant with the crime of larceny, committed within a place under the exclusive jurisdiction of the United States, known as the Military Reservation at San Juan, Porto Rico, in that he did steal, take, and carry away one gold chain, one silver bracelet, and one silver ring, all of the value of $5 of the goods and property of one George Mills then and there being, with the intent to convert the said articles to his own use.

The indictment is returned under § 5356 of the Revised Statutes (U. S. Comp. Stat. 1901, p. 3638), providing that any person committing such crime shall be punished by a fine of not more than $1,000, or imprisonment for not more than one year, or both.

The grounds of the motion are that it appears from the face of the indictment and from the evidence adduced at the trial, that the offense was committed within the limits of the military reservation at San Juan, Porto Rico, and that such reservation is not within the exclusive jurisdiction of the United States, but that this class of crimes is within the territorial jurisdiction of the insular district court of the district of San Juan, because the offense so charged is not one against the operations of the Federal government. This brings before the court for the first time, as it appears, the question whether this military post or reservation is under the exclusive jurisdiction of the United States as to crimes of this character. It is admitted that the crime in question was committed on a portion of the United States military post reserve in question, northeast of the quartermaster's stables, that is actually occupied and used by the military forces of the United States.

United States v. Hernandez.

The case is of considerable interest because of a conflict of authority that has arisen between the United States officials on said reserve, and the authorities of the insular government, owing to the killing by a soldier, some time since, of a civilian, who, it is said, was attempting to commit some crime thereon at the time. For this reason, the question of jurisdiction has been a matter of correspondence between the governor of Porto Rico and the Department of War at Washington.

Acting Judge Advocate General Crowder made an examination of the question for the Department, and, under date of June 4, 1906, rendered a very carefully considered opinion to the Honorable, the Secretary of War, holding that, under the law as he looked at it, jurisdiction over ordinary civil crimes committed upon reservations, not involving offenses against the Federal government, had passed to the insular courts, and recommended that Congress be asked for additional legislation, reclaiming this jurisdiction and vesting the same in this court. No reference is made by the judge advocate general, in this opinion of his, to the case of Benson v. United States, 146 U. S. 330, 36 L. ed. 994, 13 Sup. Ct. Rep. 60, and, as in our search we only managed to find that case by accident, it not being indexed in the digest at hand, his attention may not have been called to it. Neither did he refer to the act hereinafter referred to, passed in 1903 by the legislative assembly of Porto Rico, specifically ceding exclusive jurisdiction to the United States over the reserve in question, and all others in the island, with a slight exception, nor did counsel on either side call attention to that act or mention it until after the court found it for itself.

Secretary Taft, whose reputation as a judge is second to that of no other man, when transmitting this opinion of the judge advocate general to the governor of Porto Rico, wrote a letter expressing his legal views on the subject. And, as the opinion

United States v. Hernandez.

of the War Department and this letter of the Secretary were furnished to the court as a part of the argument of the attorney general of the island, who, by leave, appeared in this cause with counsel for the defendant; and because the Secretary's letter makes a concise statement of the jurisdiction which G. O. No. 88 of the military government gave to the provisional court on this island, we feel authorized in setting out a portion of the Secretary's letter here.

"Your letter of the 1st ult., transmitting copy of the communication of the post commander of the post of San Juan, Porto Rico, denying officials of the local insular court authority to serve process within said post, arising out of the crime of a soldier committed thereon, together with a letter of the attorney general of Porto Rico arguing the legal questions which this denial of jurisdiction presents, was referred for consideration to the judge advocate general of the Army, a copy of whose opinion is inclosed herewith.

"I concur in the opinion rendered by the acting judge advocate general in so far as it is held that the laws and ordinances of Porto Rico, when not in conflict with the laws of the United States not locally inapplicable, extend to, and are in force in and over, all lands reserved by the United States for military and other public purposes, saving always that instrumentalities of the Federal government located thereon are exempt from local control. This includes, of course, the criminal laws of the island of Porto Rico; but whether or not the enforcement of these latter within and upon such reservation is left wholly to the insular courts is, I think, open to some doubt. This doubt arises from the fact that, during the period of military government, and by virtue of G. O. 88, department of Porto Rico, 1899, which order had the force and effect of law, jurisdiction to try offenses committed by or against persons belonging to the Army or Navy,

or against their property, and offenses committed. by or against foreigners or Americans not resident in the island, traveling or temporarily sojourning therein, or against the property of non-residents, or by or against foreigners, or by or against citizens of another state, district, or territory of the United States, residing in the island, was taken from the local insular courts and vested exclusively in the United States provisional court established by that order; and further, from the fact that by § 34 of the act of April 12, 1900, the United States district court of Porto Rico is declared the successor in jurisdiction of the United States provisional court. If said G. O. 88, department of. Porto Rico, 1899, was re-enacted and continued in force under § 8 of the act of April 12, 1900, then the question is fairly raised, I think, whether or not jurisdiction in the class of cases above described has not passed to the United States district court to the exclusion of the insular courts."

From the foregoing, it can be seen that the question is not at all an easy one, because of the peculiar situation of the island of Porto Rico, and the unique status of this particular court.

It is provided by art. 1, § 8, of the Constitution of the United States, that the national government shall have power "to exercise exclusive legislation in all cases whatsoever . . . over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dockyards, and other needful buildings." The words, "exclusive legislation," are held to be equivalent to "exclusive jurisdiction." United States v. Cornell, 2 Mason, 60, Fed. Cas. No. 14,867; United States v. Tully, 140 Fed. 900.

It seems to be the settled policy of the government of the United States, certainly as to such usually small reservations as forts, magazines, arsenals, dockyards, etc., to so arrange matters that it will have and exercise sole and exclusive jurisdiction

within the boundaries thereof. This is made manifest by § 1838 of the Revised Statutes (U. S. Comp. Stat. 1901, p. 1256), which provides that, "the President of the United States is authorized to procure the assent of the legislature of any state within which any purchase of land has been made for the erection of forts, . . . [etc.] without such consent having been obtained." And by § 4661 (U. S. Comp. Stat. 1901, p. 3143), providing that, "no lighthouse, beacon, public piers, or landmark shall be built or erected on any site until cession of jurisdiction over the same has been made to the United States." It has even been held that, whenever the legislature of a state consents that the United States shall purchase any ground within its borders, such consent implies the ceding to the United States of exclusive jurisdiction within the tract described, unless the same is specifically reserved by the state. Ft. Leavenworth R. Co. v. Lowe, 114 U. S. 525, 29 L. ed. 264, 5 Sup. Ct. Rep. 995.

On the 11th day of April, 1899, Spain, by art. 2 of the treaty of Paris, ceded to the United States the island of Porto Rico, and other islands then under Spanish sovereignty in the West Indies. The military post in question had been, for several hundred years previous to that time, occupied as a fort or military post by Spain. For seven or eight months previous to the date of the treaty, the military forces of the United States had been in possession of the post, and have ever since so continued to remain in the same and hold possession thereof. On the 12th day of April, 1900, Congress passed "the organic act of Porto Rico," commonly known as the Foraker act, entitled, "An Act Temporarily to Provide Revenues and a Civil Government for Porto Rico, and for Other Purposes" (31 Stat. at L. 77, chap. 191) ; and provided in § 7 thereof, that the people of Porto Rico, together with such citizens of the United States as may reside there, should constitute a body politic under the name of "The

United States v. Hernandez.

People of Porto Rico," with governmental powers, as in the act conferred, and with power to sue and be sued.

On July 1, 1902, Congress passed an act (chap. 1383, 32 Stat. at L. 731) which is as follows:

"That the President be, and he is hereby, authorized to make, within one year after the approval of this act, such reservation of public lands and buildings belonging to the United States in the island of Porto Rico, for military, naval, lighthouse, marine hospital, postoffices, customhouses, United States courts, and other public purposes, as he may deem necessary, and all the public lands and buildings, not including harbor areas and navigable streams and bodies of water and the submerged lands underlying the same, owned by the United States in said island and not so reserved, be, and the same are hereby, granted to the government of Porto Rico, to be held or disposed of for the use and benefit of the people of said island. Provided: That said grant is upon the express condition that the government of Porto Rico, by proper authority, release to the United States any interest or claim it may have in or upon the lands or buildings reserved by the President under the provisions of this act."

It appears that, pursuant to the authority conferred upon him in the foregoing act of Congress, the President proceeded, by executive order within the time prescribed, to set aside and reserve certain public lands in Porto Rico for the purposes set forth, including the military post in question. It is true that nothing was said in this executive order with reference to excluding the jurisdiction of the insular government, if it had any, over the lands so reserved, unless the enactment of that law implies it, but, following this reservation by the President, the legislature of Porto Rico, on February 16, 1903, passed an act (Session Laws 1903, p. 110) authorizing the governor of Porto Rico, in the name of the people of Porto Rico, to convey to the

United States, for military or other public purposes, all the
right, title, and interest of the people of Porto Rico, or of any
municipality thereof, in and to various pieces of land, and all
lands that the President had reserved under the act of Congress
aforesaid. And, by § 6 of that act, provided: "That exclusive
jurisdiction be, and is hereby, ceded to the United States over
any and all lands that may hereafter be acquired by it in the
island of Porto Rico, by purchase or condemnation; and over
any and all lands and the shores thereof, including streets and
other public highways conveyed to it by the governor of Porto
Rico, under the provision hereof, and over any and all lands in
which any interest or claim of the people of Porto Rico may here-
after be released to the United States by the governor of Porto
Rico, as provided herein." And then attempted to retain con-
current jurisdiction with the United States over lands conveyed
to the government in the island of Culebra, but providing that
such jurisdiction should only be exercised upon the complaint
of the officer of the Navy or other officer of the United States in
charge at such place; and further, giving the governor power to
revoke or modify all licenses for the sale of intoxicating liquors
or merchandise of an objectionable nature at or near any naval or
military station or post now existing, or that hereafter may be
established in Porto Rico, etc. It is true that the act of Congress
above referred to did not in terms ask that exclusive jurisdiction
be granted to the United States on such reservations as the
President was authorized to make, yet the legislature, either
of its own volition, or on demand of the Department, enacted the
law as above referred to, attempting to cede to it this jurisdiction.
In 1892, in the case of Benson v. United States, 146 U. S. 330,
36 L. ed. 994, 13 Sup. Ct. Rep. 60, the Supreme Court of the
United States had this question of exclusive jurisdiction upon a
military reservation before it. The case was one where the

plaintiff in error, one Benson, was indicted in the circuit court of the United States for the district of Kansas for murder alleged to have been committed on the Fort Leavenworth military reservation within that district, and within the exclusive jurisdiction of the United States. The court reviews the two former much quoted decisions, Ft. Leavenworth R. Co. v. Lowe, 114 U. S. 525, 29 L. ed. 264, 5 Sup. Ct. Rep. 995; and the Chicago, R. I. & P. R. Co. v. McGlinn, 114 U. S. 542, 29 L. ed. 270, 5 Sup. Ct. Rep. 1005, and proceeds to say: "It was held in those cases that the act [an act of the state of Kansas of 1875, ceding jurisdiction to the United States with certain reservations] was a valid cession of jurisdiction to the general government; and that, although it did not appear that any application had been made therefor by the United States, yet, as it conferred a benefit, acceptance of the cession was to be presumed. [And that, while] it was conceded that art. 1, § 8, of the Constitution was not applicable," because the general government did not purchase Ft. Leavenworth from Kansas, as it owned it before Kansas became a state, and "that while a state has no power to cede away its territory to a foreign country, yet, it can transfer jurisdiction to the general government."

In this Benson Case the court further says: "It is contended by appellant's counsel, that within the scope of those decisions [the two previous Ft. Leavenworth cases], jurisdiction passed to the general government only over such portions of the reserve as are actually used for military purposes, and that the particular part of the reserve on which the crime charged was committed, was used solely for farming purposes."

The court then proceeded to announce a doctrine that appears to be controlling in the case at bar. It used this language: "But in matters of that kind, the courts follow the action of the political department of the government. The en-

United States v. Hernandez.

tire tract had been legally reserved for military purposes. United States v. Stone, 2 Wall. 525, 537, 17 L. ed. 765, 767. The character and purposes of its occupation having been officially and legally established by that branch of the government which has control over such matters, it is not open to the courts, on a question of jurisdiction, to inquire what may be the actual uses to which any portion of the reserve is temporarily put. There was therefore jurisdiction in the circuit court; and the first contention of plaintiff in error must be overruled."

As to the case at bar, not only had Spain for hundreds of years used the ground in question as a military post, but, ever since its first occupation, previous to the treaty of Paris, by the troops of the United States, down to the present time, it has been so occupied and used by the government of the United States; and certainly, its reservation, under the act of Congress, by the President as a military post, did, in our opinion, in the light of the decision last above quoted, legally establish the fact that it is so used.

It is strenuously contended by the attorney general for the island that the Foraker act, when it says, in § 1 thereof, "That the provisions of this act shall apply to the island of Porto Rico and to the adjacent islands and waters of the islands," etc., necessarily confers jurisdiction over the entire island upon the insular courts, which were created by said same act in § 33 thereof.

It might be well to point out at this place that said same § 33 also provides that the legislature of Porto Rico "shall have authority to legislate from time to time as it may see fit with respect to said courts, and any others they may deem it advisable to establish, their organization, the number of judges and officials and *attachés* for each, their jurisdiction, their procedure, and all other matters affecting them."

During the military occupation of the island of Porto Rico, prior to the passage of the Foraker act, in addition to the ordinary insular courts that the military authorities continued or established, a United States provisional court, so-called, was established by G. O. 88, as mentioned in Secretary Taft's letter aforesaid. And § 34 of the Foraker act, which created this court, provided that it should be the successor to the said United States provisional court, and, of course, takes the jurisdiction it had, as set forth in the extract from Secretary Taft's letter above.

It therefore appears that not only is it the policy of the United States to exercise exclusive jurisdiction over its forts, magazines, arsenals, dockyards, etc., even if it does not exercise jurisdiction to that extent over large Indian reservations and forest reserves in the public-land states and territories. Therefore, every presumption, especially in a place like Porto Rico, where the general government is not only the actual proprietor, but the sovereign, should be indulged in its favor. This view gains force from the fact that it is the first territory or jurisdiction save Hawaii, not a state, where a court, such as this is, has been established.

It was contended by the attorney general for the island that, if the United States shall be held to have exclusive jurisdiction over these parcels of ground thus reserved by the President under the act of Congress, then many crimes will go unpunished, because he contends there is no law of the general government to punish many crimes which can occur in such places. It may be admitted that this is probably true, because the act of July 7, 1898 (30 Stat. at L. 717, chap. 576, § 2, U. S. Comp. Stat. 1901, p. 3652), providing "that when any offense is committed in any place, jurisdiction over which has been retained by the United States or ceded to it by a state, or which has been pur-

chased with the consent of a state, for the erection of a fort, magazine, arsenal, dockyard, or other needful building or structure, the punishment for which offense is not provided for by any law of the United States, the person committing such offense shall . . . be liable to and receive the same punishment as the laws of the state in which such place is situated, now provide for the like offense," etc., cannot be held to be applicable; first, because it applies specially to states; and next, because it was enacted about eighteen days before General Miles landed in Porto Rico; still there are enough laws of the general government to punish the ordinary crimes that can be committed on such reservations, and, at any rate, it is the province of Congress, and not of the court, to remedy this evil. In fact, that this act would not apply has been specifically held in United States v. Paul, 6 Pet. 141, 8 L. ed. 348, because it was there held to be limited to the laws of the states in force at the time of its enactment. The statute passed upon in that case was the statute of which the one referred to is an amendment.

It is interesting to consider the unique conditions existing in this island at the time of the change of sovereignty, because such conditions must have been what induced the military government to organize the provisional court in the nature of a United States court, and must have been what induced Congress, in the Foraker act (31 Stat. at L. 77, chap. 191, § 34), to create this court, and make it the successor of the provisional court, and to give it, in that same act, the ordinary jurisdiction of a district and circuit court of the United States, and thereafter, by an amendment, under § 3 of the act of 1901 (31 Stat. at L. 953, chap. 812), to increase that jurisdiction even beyond the limits that similar courts have in the states. While this court is unique in its organization, and cannot be held, since the decision in Clinton v. Englebrecht, 13 Wall. 434, 20 L. ed.

United States v. Hernandez.

659, to be "a court of the United States" in the strict sense, as it would be were it organized under § 1, art. 3, of the Constitution, still it is manifestly intended in this island to occupy not only the position of a district and circuit court of the United States in a state, but is intended, and is given, a wider jurisdiction for purposes that seemed sufficient to Congress. This fact, coupled with the action of Congress in creating the people of Porto Rico into a body politic without citizenship, while yet owing permanent allegiance to the United States, and its further action in granting to the government of the island large numbers of buildings and large quantities of land, and authorizing the President to reserve all the forts, buildings, lands, and sites referred to, exhibits an intention on the part of Congress to reserve to itself sole and exclusive jurisdiction over the portions of the island which it occupies for its own purposes, as fully as it does in a state. This we think is the law.

It is not necessary to hold in this case, and no opinion is expressed, as to what the opinion of the court would be in a case (and the court understands there are such) where the government has not yet taken any possession and does not actually occupy particular portions of the land reserved by the President under the act of Congress of July 2d, herein referred to. We do not decide anything with reference to the service of civil process from the insular courts in a proper manner upon these reservations.

Under all the circumstances, we do not think that the mere general language used § 1 of the Foraker act, "that the provisions of this act shall apply to the island of Porto Rico and to the adjacent islands and waters of the islands," etc., was intended by Congress to confer jurisdiction upon the insular courts over military posts and such like reservations, the jurisdiction of which in the states it takes particular pains, under the Con-

stitution, to keep to itself, especially when Congress at the same time felt the necessity of establishing in this island a court such as this is. Even if that language of the Foraker act, or any other language contained therein, can be held to have that effect, then the legislature of Porto Rico, by the act of 1903, herein referred to, devested itself of such jurisdiction; and, under a rule that has obtained in the other territories for many decades, all acts of a territorial legislature not disapproved by Congress within a reasonable time are held to be approved, unless unconstitutional. And it is not at all uncertain but what Congress specifically gave the legislative assembly of Porto Rico power to pass the very act in question, in § 34 of the Foraker act above quoted, when it set forth that the legislature might legislate with reference to the jurisdiction of the courts.

In small military posts, such as the one in question is, covered with barracks, fortifications, military buildings, and conveniences, and patrolled night and day by United States soldiers, any interference by the local courts would be liable to impede the instrumentalities of the government. We are aware that it can be argued with force that it is doubtful if the legislative assembly of Porto Rico, being the creature of Congress, can devest the insular courts of any jurisdiction which Congress has commanded these courts to assume; but, as stated, we do not think Congress has so commanded them.

As stated at the outset, it has not been an easy matter to come to a conclusion in this case, in the light of the conflicting decisions, most of which depend upon particular acts of the legislatures of sovereign states. The court has examined with care the following cases: United States v. Bevens, 3 Wheat. 336, 4 L. ed. 404; United States v. Ames, 1 Woob. & M. 76, Fed. Cas. No. 14,441; United States v. Stahl, Woolw. 192, Fed. Cas. No. 16,373; United States v. Clark, 31 Fed. 710; United States

United States v. Hernandez.

v. Bateman, 34 Fed. 86. This latter case refers to the presidio military reservation or post at San Francisco, and is very interesting because of the surrounding circumstances being so similar; but it is not an authority, because California is a sovereign state. Territory v. Burgess, 8 Mont. 57, 1 L.R.A. 808, 19 Pac. 558; United States v. McBratney, 104 U. S. 621, 26 L. ed. 869; United States v. Tully, 140 Fed. 899. This case is anomalous in that the difference of opinion between the supreme court of Montana and the Federal judge for that district resulted in a man convicted of murder in the state court going unwhipped of justice. The crime was committed on a school section of land over which the buildings belonging to a military post happened to be located, and which land was not, and could not be, legally included in the military reserve, as the land had been previously granted to the state. Re Gon-shay-ee, 130 U. S. 347, 32 L. ed. 974, 9 Sup. Ct. Rep. 542; Draper v. United States, 164 U. S. 240, 41 L. ed. 419, 17 Sup. Ct. Rep. 107.

For the reasons given, the motion in arrest will be denied, and it is so ordered.